## Lewis' Estate.

Argued May 12, 1942.  Before MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*R. M. Remick,* of *Saul, Ewing, Remick & Harrison,* for appellants.

*Clarence E. Hall,* with him *William Carson Bodine, Boyd Lee Spahr, Pierce Archer, Jr., Orr, Hall & Williams* and *John W. Bohlen,* for appellees.

OPINION BY MR. JUSTICE PATTERSON, May 25, 1942:
This appeal is from a decree of the Orphans' Court of Philadelphia County imposing a surcharge upon testa-

mentary trustees for losses resulting from their undue retention of non-legal securities.

Clarence R. Lewis, the testator, died on October 16, 1919, leaving a will, dated March 7, 1919, disposing of his residuary estate as follows: "The remainder of my estate not otherwise mentioned real personal or mixed, I direct shall be held in trust for my dear sister Helen Pauline Roberts and the income paid to her during her life at her death the estate shall be divided between my nephews and nieces each and all receiving share & share alike." At the adjudication of the account of the executors, Samuel Bell, Jr., and T. Harry Dixon, on October 11, 1920, assets valued at $68,106.48 were awarded to them, as trustees, including 30 shares of stock of the Commercial Trust Company, later Bank of North America and Trust Company, and now The Pennsylvania Company for Insurances on Lives and Granting Annuities. Testator's will conferred no power on the trustees to invest in or retain securities not legal for the investment of trust funds.

Upon the death of T. Harry Dixon, on June 18, 1922, an account was filed by Samuel Bell, Jr., as surviving trustee, showing that the 30 shares of Commercial Trust Company stock were still retained as an asset of the trust, which account was confirmed on November 9, 1922, and the balance, "as composed in the account as stated", awarded to the remaining individual trustee and the Pennsylvania Company, as substituted trustee. Samuel Bell, Jr., died on August 28, 1929, whereupon the Pennsylvania Company filed an account covering the. period from its appointment to December 13, 1929, disclosing that on March 7, 1923, the trustees received 42 shares of stock of the Bank of North America and Trust Company, in lieu of the 30 shares of Commercial Trust Company (41 2/8 shares by exchange and 6/8 of a share by purchase), which they retained until July 9, 1929, and exchanged, on that date, for 168 shares of the Pennsylvania Company, the corporate trustee, these corporations hav-

ing merged on or about the dates given. This account was confirmed on January 13, 1930, and the balance, "composed as indicated in the account", was awarded to the corporate trustee and Samuel Bell, 3rd, substituted trustee, the present accountants. The original holding of 30 shares of Commercial Trust Company stock was inventoried at $8,550 and the purchase of the fractional share of Bank of North America and Trust Company increased the value at which the Pennsylvania Company stock was carried to $8,632.50.

The life tenant, Helen Pauline Roberts, died on July 24, 1938, terminating the trust, and the accountants then filed their final account, on November 2, 1938, showing receipt of the Pennsylvania Company stock at $8,632.50, under the award of January 13, 1930, its continued retention by accountants, and its inclusion in the balance for distribution. At the audit, the remaindermen objected to the retention of this investment and requested that accountants be surcharged. In his adjudication, filed January 27, 1940, the auditing judge concluded that no exceptional circumstances had been shown justifying retention of the securities by the trustees and that, under the facts of this case, a year from the date of confirmation of the last prior account, January 13, 1930, was the limit of time within which the trustees should have converted. A surcharge was imposed in the amount of $78 per share, or a total of $13,104, representing the market value of the stock on January 13, 1931. Exceptions were filed by accountants but consideration of them was deferred by the court pending our decision in *Casani's Estate*, 342 Pa. 468. After argument, the court en banc dismissed the exceptions to the adjudication and affirmed the surcharge. This appeal was then taken by the corporate trustee.

In the absence of any provision authorizing the retention of non-legal investments, it is presumed that the settlor or testator, as the case may be, intended the trust estate should be invested in securities legal for the in-

vestment of trust funds, and not otherwise. Accordingly, it is well settled that, unless expressly excused from so doing, trustees receiving non-legals as part of the assets of the trust estate are under a duty to convert them into legal securities with reasonable diligence, which means within a reasonable time considering the circumstances: *Casani's Estate,* supra, 472. The matter of determining what constitutes a reasonable time for conversion is the responsibility of the trustee, in the first instance, and if he continues to hold the investments, awaiting what he should consider a proper time to sell, resulting in a loss to the estate, he is required to assume the burden of justifying the retention: *Taylor's Estate,* 277 Pa. 518, 528; *Brown's Estate,* 287 Pa. 499, 502; *Casani's Estate,* supra, 473; *Quinn's Estate,* 342 Pa. 509, 512. In the language of *Taylor's Estate,* supra, page 528, quoted with approval in *Casani's Estate,* supra, 471, 473, the record must affirmatively show that the temporary retention was not the result of "a mere lack of attention", but that the trustee was "ordinarily watchful" in his endeavors to ascertain whether time for sale had come, at a price which should have been taken, and that his decision that it had not was the product of an "honest exercise of judgment based on actual consideration of existing conditions." See also *Brown's Estate,* supra, 502; *Nola's Estate,* 333 Pa. 106, 109. Since what constitutes "reasonable diligence" or "a reasonable time" necessarily varies with the circumstances, precedents are of little value; each case must, of necessity, be determined largely upon its own facts. Thus, in *Casani's Estate,* supra, it was held that eight years was not too long to hold the securities, under the circumstances there disclosed, whereas in *Seamans' Estate,* 333 Pa. 358, a year was fixed as the limit of time within which conversion should have been made, in the facts of that particular case. However long or short the period may be, if the trustee's retention of the non-legal securities is challenged, and it appears, upon judicial review, that he has been normally watch-

ful and that his decision as to the time for conversion was, under the circumstances, consonant with the exercise of ordinarily good business judgment or foresight, he may not be subjected to liability for failure to convert; unless this is affirmatively made to appear, however, he must be surcharged for a failure to convert, in an amount equal to what the securities would have brought had he exercised due care: *Brown's Estate*, supra, 504; *Seaman's Estate*, supra, 366.

What were the circumstances in the present case? The non-legal securities in question were received by accountants, under the award of January 13, 1930, at a valuation of $8,632.50, or $51.38 per share. The book value of the stock as of December 31, 1929, was $57 per share. During the year 1929, it had reached a high of $175 per share and a low of $95, in November or December, but at the time accountants received it, and for a period of more than three months thereafter, was selling on the open market at prices ranging from $113 to $116.25, or more than double the inventory value, twice the book value, and $18 to $21.25 per share above the low of the previous year. After April 30, 1930, the stock depreciated, but could have been disposed of, at a figure substantially above the book and inventory values, at any time during 1930, without seriously affecting its market price. Mr. Brandon Barringer, vice-president of the corporate trustee, in charge of the analysis of trust investments, testified that numerous reviews of the securities were made, both before and after January, 1930, and that "it was noted that this was a non-legal, *retained deliberately*, because we thought it was in the interest of the trust in a legal account." Again, he testified as follows: "Q. In making this review, did you determine to sell any of this stock during 1930? A. . . . You remember the price was steadily rising and a trustee naturally sells on a rising market, but when he is faced with a falling market, which he *hopes* will turn around, he is very much more reluctant to sell. That stock had

been to $160.00 a share. It dropped very suddenly with the 1929 panic to $125.00 a share and *we thought there would be some recovery. There was none.*" Mr. Barringer further testified that Mr. Bell, the individual trustee, was not consulted with reference to the sale or retention of the stock, at any time, and Mr. Bell, in turn, testified that he never "suggested or requested of the Pennsylvania Company the sale of the stock", although he was at all times aware of its presence in the account.

Under these circumstances, we cannot say, as appellant would have us do, that the court erred in fixing a year from the adjudication of 1930, a period of more than ten years after the executors' account and over eight years since the non-legal securities came into the hands of the corporate trustee, as the limit of time within which a conversion should have taken place. And, in arriving at this conclusion we have given no consideration to the fact that the retained investments were the corporate trustee's own stock, this feature of the case having been eliminated by stipulation of counsel. As appellees state: "All that has been shown by the appellant is that the corporate trustee, without consulting its co-trustee, retained these stocks deliberately because it thought this was 'in the interest of the trust', and because it felt that 'the stock should be kept.' Nowhere in the record are there facts which justify the latter conclusions. All the facts indicate the necessity for promptness in converting these securities." In *Casani's Estate,* supra, it was apparent at no time in the testimony "that the retention by the trustee was by way of speculation or to hold on in order to receive a better price than the securities were reasonably worth" and a sale would have resulted in "an unreasonable sacrifice in respect of both principal and income", whereas the record in the present case shows just the opposite. In addition to disclosing that the stock was readily salable at a figure substantially higher than its inventory and book values, for more than a year after the trustees last received it, the record also

shows that it was retained despite a known sacrifice of income to the estate as compared with the then current yield of authorized mortgage investments. *Quinn's Estate,* also supra, is likewise clearly distinguishable. There the securities were unlisted, the decline in price was extraordinarily sharp and rapid, the market for the stock was thin, and offering for sale the comparatively large number of shares held by the estate would no doubt have broken the market price still further; under such circumstances, there was no market into which the trustee could go and prudently dispose of the securities, and for this reason a surcharge was denied. Here, it is admitted that the stock could have been sold on the open market, throughout the entire period of retention, and that the sale of the relatively few shares held by the estate, at any time during 1930, would have had no effect on the market price. As said in *Seamans' Estate,* supra, in language applicable to the facts of this case (p. 362) : "The mere fact that a trustee may honestly believe that an unauthorized security will appreciate in value at some more or less remote period is not sufficient justification for his retention of it in the trust estate, and 'common prudence' or 'normally good judgment' must not be deemed to confer such latitude of discretion."

The contention that appellees were barred from demanding a surcharge, because of acquiescence or laches, may be disposed of briefly. In *Clabby's Estate,* 338 Pa. 305, relied upon by appellant, the exceptants were familiar with the details of the administration of the trust from its inception, had provisionally approved retention of the securities, in writing, and for a period of fourteen years thereafter received and accepted dividends, with full knowledge of all the facts. We held that these circumstances estopped them, stating the rule as follows (p. 312) : "A competent beneficiary who with full knowledge of the facts and of his rights expressly consents to or affirms an investment by the trustee cannot, in the absence of fraud, thereafter question its pro-

594

priety . . . Affirmance of the investment may be implied from failure of the beneficiary to object within a reasonable time, although aware of the facts and continually receiving benefits from the investment." Here, exceptants have never affirmatively approved of the unauthorized securities, nor have they received any benefits and, so far as appears, were not aware of their presence in the trust at any time during the period covered by the present accounting. Moreover, it must not be lost sight of that the present exceptants are remaindermen and were not expected to give special attention to the trust until the death of the life tenant on July 24, 1938, only three months before the filing of the present account, when their rights accrued. See *Montgomery's Appeal,* 77 Pa. 370, 373; *Wilbur's Estate,* 334 Pa. 45, 55. Nor can we assent to appellant's argument that the adjudications of the executors' account and the two prior accounts of the trustees, showing retention of the non-legal investment, excuses them from failure to convert during the period of the present accounting. In the absence of objection to the administration of the item in question, within five years, confirmation of the last prior account, on January 13, 1930, effectively insulated the trustees against surcharge for failure to convert prior to that date; it did not, however, have any effect as absolving them from liability for any loss owing to their undue retention of the non-legal securities thereafter: *Kelch's Estate,* 318 Pa. 296, 297, 298; *Jones' Estate,* 344 Pa. 100, 104.

Decree affirmed. Costs to be paid by appellant.

The Chief Justice did not participate in the decision of this case.

Mr. Justice LINN thinks the record shows that no surcharge should be imposed.